[No. F023689. Fifth Dist. Jan. 20, 1998.]

PLEASANT VALLEY CANAL COMPANY, Plaintiff and Appellant, v. BRUCE BORROR et al., Defendants and Appellants.

**COUNSEL**

Spallina & Krase and Fred V. Spallina for Plaintiff and Appellant.

Wagner & Wagner, Bryan N. Wagner and Matthew C. Wagner for Defendants and Appellants.

**OPINION**

**BUCKLEY, J.**—This is a dispute between two water users over their respective rights to divert water from the upper Tule River in the foothills above Springville in southern Tulare County. The Pleasant Valley Canal Company (Pleasant Valley) is a mutual water company that distributes water to about 80 shareholders along an 8.3-mile ditch. The shareholders own approximately 1,400 acres which include fruit orchards, irrigated pasture, a private golf course, and a catfish pond. The Pleasant Valley Canal takes its water from the Middle Fork of the Tule River, downstream from a cattle ranch operated by the Borror family.[1]

The Borrors own some 1,385 acres of land straddling both the Middle and North Forks of the river. For as long as anyone can remember, but at least since the family first moved there in 1930, the property has been used to graze cattle. Most of the cattle, numbering up to 600 head in the summertime, belong to other people who pay the Borrors a grazing fee. The land is

---

[1]Most of the property that now comprises the Borrors' ranch was leased in 1930 and then sold in 1936 to Francis Borror and his two sons, Mark and Dale. They operated the ranch as the Sequoia Stock Farm. The property eventually passed to Mark and his wife Fern, who later transferred a one-half interest to their son Bruce and his wife Eleanor. When Mark died in 1981, Bruce and Eleanor became the cotrustees of a trust Mark had created for their benefit with his one-quarter community property interest in the ranch. When Fern died in 1987, her one-quarter interest was placed in a trust with Bryan Borror, Bruce and Eleanor's son, as trustee. In 1992, Bruce and Eleanor, a corporation they evidently controlled known as Sequoia Land and Power, Inc., and the two trusts transferred the ranch to a general partnership known as Sequoia Ranch Estates. The Borror family in their various capacities own a 40 percent interest in the partnership, and remain in charge of the day-to-day operation of the ranch. Ten percent of Sequoia Ranch Estates is owned by the Wagner Partnership made up of the Borrors' attorneys in this case, Bryan and Matthew Wagner, and their father James Wagner. The remaining 50 percent is owned by SWD Investments, Inc., whose president is James Wagner. The parties have reportedly stipulated to an amendment of the complaint naming Sequoia Ranch Estates as a defendant. We will continue to refer to these various entities collectively as the Borrors.

generally steep, dry range land but includes about 225 acres of permanent pasture. The Borrors flood irrigate this pasture with water diverted from the Middle Fork through what is known as the Duncan Ditch, named after the man who originally settled the property.

Pleasant Valley and the Borrors coexisted peaceably as neighboring water users for many years until an unusual combination of natural and manmade circumstances briefly disrupted the normal flows in the Tule River.

The Southern California Edison Company (Edison Company) operates a hydroelectric power plant just eastward and upstream from the Borrors' property. Water is delivered to the plant through a flume originating at the forebay of a dam built higher up on the Middle Fork, and is then returned from the plant to the river through a tailrace. The Duncan Ditch ordinarily takes its water from the Edison tailrace rather than directly from the Middle Fork.

In the summer of 1990, the Edison Company shut down the power plant for maintenance, as it had done occasionally in the past. It flushed its forebay and, with the Borrors' permission, ran the drainage water to a pond on their property in order to settle out the accumulated silt before returning the water to the river. The company also stopped diverting water to the plant with the result that all the water in the Middle Fork then flowed through the Borrors' property in the natural riverbed. Without any water in the Edison tailrace, the Borrors had to find another way to supply the Duncan Ditch. They built a temporary dam on the river and piped water from there into the tailrace; they then blocked the tailrace so the water would back up to the headgate of the Duncan Ditch.

This arrangement appears to have worked satisfactorily for the next few months. That is, the Borrors continued to receive their customary amount of water and enough flowed past the temporary dam to satisfy the needs of the users downstream, including Pleasant Valley. But 1990 was the fourth in a succession of dry years and Pleasant Valley was forced to curtail water deliveries to some of its shareholders by the end of the summer. Pasture land and parts of the golf course were left to turn brown. This situation prompted Pleasant Valley to examine the water use of its upstream neighbors. It looked first to the two ditch companies between it and the Duncan Ditch. In August, Pleasant Valley sued the Graham-Osborn and Mt. Whitney ditch companies alleging their diversions were interfering with what Pleasant Valley claimed were its superior water rights. The matter was subsequently settled pursuant to a mutual allocation agreement requiring all three companies to reduce their diversions proportionally during low-water periods.

Then in early October the Edison Company reactivated its power plant and began once again diverting water from the Middle Fork. This caused the already low flows in the river to drop even more for about two weeks while the company refilled its forebay. Faced with this additional loss of water, some Pleasant Valley shareholders looked still farther upstream for the reason for the shortage. From State Highway 190, where it runs along the river through the Borrors' property, they saw that the Borrors' pasture was lush and green and, in fact, that water was running off it into a culvert next to the highway. They also noticed the Borrors' makeshift dam and diversion works for the Duncan Ditch.

On October 5, 1990, Pleasant Valley filed a complaint against the Borrors for declaratory and injunctive relief and for damages, along with an ex parte application for a temporary restraining order. Pleasant Valley alleged the Borrors were diverting more than their rightful share of the water in the Middle Fork and their use of the water was unreasonable and wasteful, thereby depriving Pleasant Valley of its full entitlement. These allegations were founded upon two documents which were to figure prominently in the subsequent trial, and which are now central to this appeal.

The first is a 1916 judgment of the Tulare County Superior Court in an action brought by the Poplar Irrigation Company against numerous upstream water users on the Tule River, including the predecessors in interest to the water rights now held by Pleasant Valley and the Borrors (the Poplar decision). Based upon stipulated agreements between the irrigation company and the various defendants, the decision specifies the amount of water each defendant is entitled to divert from the river and, in some cases, identifies the property where the water may be used. As discussed more fully below, Pleasant Valley and the Borrors disagree about whether the Poplar decision is binding as between them. If it is, they disagree further about whether the decision was intended to adjudicate all or only some of the Borrors' water rights, and about whether those rights are appropriative or riparian in nature.

The second significant document is a 164-page report published in 1964 by the State of California Department of Water Resources entitled Land and Water Use in Tule River Hydrographic Unit and more commonly identified as Bulletin No. 94-1. Bulletin No. 94-1 attempts to provide a comprehensive survey of water diversions within the Tule River watershed. It is most important for purposes of this case insofar as it purports to identify the parties' water rights, relying largely on its own interpretation of the Poplar decision. The parties disagree about what weight, if any, should be given to the report's conclusions in this regard.

Pleasant Valley alleged in its pleadings that the Borrors were diverting water well in excess of the amount they were entitled to take pursuant to the

Poplar decision, which entitlement Pleasant Valley characterized as an appropriative right. It alleged further that the Borrors' riparian rights, if any, did not extend to their wasteful uses of the water. In their answer to the complaint, the Borrors asserted they did indeed have riparian rights in addition to the appropriative rights adjudicated in Poplar, and they were putting the water to reasonable beneficial uses. The Borrors also asserted their diversions were not the proximate cause of Pleasant Valley's shortages, and that Pleasant Valley's claims were barred by the doctrine of unclean hands.

Following a hearing on Pleasant Valley's application for a temporary restraining order, the court directed the Borrors to remove their makeshift dam but declined at that time to restrain their water use. The court then ordered the Borrors to show cause why a preliminary injunction should not issue limiting their diversions to the amount specified in Poplar. A separate show cause hearing was set to determine if the Borrors should be required to install measuring devices at their two diversion points on the Edison tailrace. This second question was resolved without a hearing when the Borrors stipulated to an order requiring them to install the devices by April 10, 1991.

The hearing on the first question was held on November 28, 1990. Pleasant Valley continued to maintain that Poplar was determinative of all the Borrors' water rights but, notwithstanding its earlier characterization of those rights as appropriative, Pleasant Valley now claimed they were riparian. The Borrors countered that Poplar, to the extent it is binding in the present context, adjudicated only their appropriative rights, leaving untouched their riparian and prescriptive uses. There was also considerable discussion about whether the Borrors' flood irrigation practices are an efficient use of water under the circumstances.

The court denied Pleasant Valley's request for a preliminary injunction. It explained: "A review of the evidence adduced at this hearing supports a finding that Defendant has riparian rights to water from the Tule River which are unaffected by the Poplar decision rendered in 1916. Furthermore, the evidence fails to support a finding that Defendant diverted water from the Tule River in excess of what he needed for reasonable irrigation purposes or that he was wasting or making improper use of water he used from the Tule River."

The matter went to trial in December of 1994, and centered once again on the nature and extent of the Borrors' water rights adjudicated in the Poplar

case and on the suitability of their water use.[2] In a statement of decision filed March 13, 1995, the court found Poplar had established a "comprehensive allocation" of all the parties' water rights, whether riparian, appropriative, or prescriptive; that the Borrors' predecessors in interest had "bargained away" any other rights they may have had at the time; and that the Borrors had not acquired any additional rights since then. It found further that the Borrors' flood irrigation methods, although "antiquated," were "reasonably efficient" under the circumstances. Accordingly, the court, in a judgment filed the same day, permanently enjoined the Borrors from diverting more water than their Poplar allocation and from using the water on land other than that described in the decision.[3] The effect of the court's order was to reduce the Borrors' long-standing water use by over half, in terms of both the amount they were permitted to divert and the lands they could irrigate.

The Borrors and Pleasant Valley, respectively, have filed timely notices of appeal and cross-appeal from the judgment. We affirm in part, reverse in part, and remand the matter for further proceedings.

## I. BACKGROUND

Our resolution of the issues depends in large part upon an analysis of the Poplar decision. As this brief introduction suggests, the intended scope of the decision is difficult to determine from within the four corners of the document itself. Moreover, the Tule River water users whose rights are affected by the decision, and the present parties in particular, have managed for the 75 years since it was rendered to divert water from the river without apparent conflict, each according to their own idea of what it means. They have not given it one consistent interpretation nor have they been required to, until now. It is necessary therefore to begin at the beginning and examine the Poplar decision in the context of both the development of water law in California and the historical use of water on the Borrors' property.

### A. Water Law in California.[4]

What is now California was part of Mexico when gold was discovered in the Sierra Nevada in 1848. Less than six months later, it and other regions of

---

[2]Pleasant Valley claimed at trial to have suffered additional water shortages in 1992 and 1994.

[3]The court also ordered the Borrors to install a measuring device on the Duncan Ditch at or near the point where it diverts water from the Edison tailrace, and, with the exception of an existing two-inch pipe, to "immediately destroy and permanently block all other pipelines, conduits, or other diversions" from both the tailrace and the river. The Borrors do not challenge this part of the judgment.

[4]For a more thorough discussion of this subject, see Hutchins, The California Law of Water Rights (1956); Slater, California Water Law and Policy (1995); 62 Cal.Jur.3d, Water; Attwater and Markle, *Overview of California Water Rights and Water Quality Law* (1988) 19

the west were ceded to the United States by the Treaty of Guadalupe Hidalgo, concluding the war between the two countries. With the exception of property granted by the former Spanish and Mexican ruling governments, the entire area thereby became part of the public lands of the United States. The inhabitants, attracted in great numbers by the prospect of gold, soon adopted a Constitution and elected a Legislature in preparation for admission into the Union in 1850. Among its first acts, the Legislature declared that the common law of England should become the rule of decision in the courts, insofar as it was in harmony with the federal Constitution and the laws and Constitution of the state. (See now Civ. Code, § 22.2.) Thus the stage was set for the development of the three species of water rights still recognized in California: pueblo, riparian, and appropriative. We are not concerned here with pueblo water rights, which apply only to the municipal successors of the former Spanish and Mexican pueblos. However, a review of the evolution of the riparian and appropriation doctrines in the years preceding the Poplar decision will be helpful in determining the nature of the water rights adjudicated in that case.

The English common law adopted by California included the doctrine of riparian rights, which generally conferred upon the owners of lands adjoining a stream the common right to use the water on those lands. But the doctrine had little application in the mining areas where most of the early settlement in the state took place. The miners were technically trespassers on land belonging to the United States and so had no right to either the land or the water. They were allowed nonetheless to work their claims without interference from the government, and soon developed a system among themselves to protect what interests they had acquired by occupation. (*Jennison* v. *Kirk* (1878) 98 U.S. 453, 457-458 [25 L.Ed. 240, 242-243].)

"[I]n the mountains of California there developed a combination of circumstances unprecedented in the long and litigious history of running water. Its effects on water laws were also unprecedented. Almost at the time when Mexico ceded California, with other territories, to the United States, gold was discovered there and a rush of hardy, aggressive and venturesome pioneers began. If the high lands were to yield their treasure to prospectors, water was essential to separate the precious from the dross. The miner's need was more than a convenience—it was a necessity; and necessity knows no law. But conditions were favorable for necessity to make law, and it did—law unlike any that had been known in any part of the Western world.

"The adventurers were in a little-inhabited, unsurveyed, unowned and almost ungoverned country, theretofore thought to have little value. It had

Pacific L.J. 957; Shaw, *The Development of the Law of Waters in the West* (1922) 10 Cal.L.Rev. 443.

become public domain of the United States and miners regarded waters as well as lands subject to preemption. To be first in possession was to be best in title. Priority—of discovery, location and appropriation—was the primary source of rights. Fortuitously, along lower reaches of the streams there were no riparian owners to be injured and none to challenge customs of the miners." (*U.S.* v. *Gerlach Live Stock Co.* (1950) 339 U.S. 725, 745-746 [70 S.Ct. 955, 966, 94 L.Ed. 1231, 20 A.L.R.2d 633].)

In 1851, the state Legislature decreed that the "customs, usages, or regulations" established by the miners, when not in conflict with the Constitution or laws of the state, would thereafter govern the resolution of disputes between them. (See now Code Civ. Proc., § 748.) "The custom of appropriating water thus acquired some authority, notwithstanding its contradiction with the common law. A practice that was law in the mountains was contrary to the law on the books. Here were provocations to controversy that soon came to the newly established state courts." (*U.S.* v. *Gerlach Live Stock Co., supra,* 339 U.S. at p. 746 [70 S.Ct. at p. 966].)

The potential for conflict between the two water rights doctrines increased with passage of the Homestead Act of 1862, which opened federal land to preemption and established a procedure for obtaining formal title. In 1866, Congress recognized the miners' appropriative rights acquired under local custom by virtue of their diversion and use of water. A supplementary act in 1870 provided that all homestead and preemption claims, and all patents granted for public land, would be subject to the rights acquired pursuant to the Mining Act of 1866. Thus, the United States effectively waived for itself and its successors its riparian rights on publicly held land to the extent appropriative rights had vested prior to transfer of the land into private ownership. Collectively, the 1866 and 1870 acts validated the states' authority to establish rules and procedures for acquiring water rights. (*California* v. *United States* (1978) 438 U.S. 645, 653-658 [98 S.Ct. 2985, 2989-2993, 57 L.Ed.2d 1018]; *Cave* v. *Tyler* (1901) 133 Cal. 566 [65 P. 1089].)

In 1872, the state Legislature added provisions to the Civil Code—essentially a codification of the rules that had grown up in the mining camps—creating a statutory procedure for securing appropriative water rights. The procedure was not exclusive however; valid rights still could be obtained simply by diverting water and putting it to a beneficial use. (See now Civ. Code, §§ 1410a-1422; *Lower Tule etc. Co.* v. *Angiola etc. Co.* (1906) 149 Cal. 496, 499 [86 P. 1081].)

The inattention given in these early years to the riparian doctrine, together with a belief riparianism was not suited to the state's arid climate, led many

people to conclude California had arrived at a purely appropriative system of water rights. But in 1886, a closely divided Supreme Court held the doctrine of riparian rights had been adopted in 1850 with the common law and still prevailed in California. (*Lux* v. *Haggin* (1886) 69 Cal. 255 [10 P. 674].) The right, according to the court, attached to riparian land when it passed into private ownership and, although subject to appropriations made on the public domain prior to that time, was superior to the rights of all other appropriators. (*Ibid.*)

California thus adopted a dual system of water rights. Under common law principles, riparian owners shared with one another a right to the entire natural flow of the stream running through their properties. That is, they were entitled to proportional shares of the water depending upon how much each was then applying to a reasonable beneficial use. The right protected prospective uses as well, so their respective entitlements might change as their uses changed. They were, however, required to use the water on their riparian land. Appropriators, on the other hand, were entitled to use only as much water as they could put to a reasonable beneficial use, and only then to the extent their use did not interfere with the rights of riparians or senior appropriators. The right could be lost by disuse but could not be expanded except by a new appropriation. Unlike riparian rights, appropriative rights were not tied to the land; appropriated water could be put to a different use or used at another location if that could be done without injury to others. (Hutchins, The Cal. Law of Water Rights, *supra*, at pp. 40-67.) Most importantly, although riparians were limited to reasonable uses among themselves, there was no such restriction on their right relative to appropriators; they were entitled to the full flow of the stream even if the uses to which they were putting the water were unreasonable or wasteful. (*Herminghaus* v. *South. California Edison Co.* (1926) 200 Cal. 81, 100-101 [252 P. 607]; *Miller & Lux* v. *Madera Canal etc. Co.* (1909) 155 Cal. 59, 64 [99 P. 502].)

This, generally, was the state of the law when the Poplar Irrigation Company sued to establish its rights with respect to upstream water users on the Tule River. It is still the law today, with some notable exceptions. As agriculture surpassed mining in importance, and more of the state passed into private ownership, land development grew increasingly dependent on the appropriation of water. California's dual system of water rights was criticized for the preference it gave to riparian uses even if they were unreasonable or as yet unexercised. The modern trend has been toward limiting these aspects of the riparian doctrine.

In 1914, the state adopted the Water Commission Act, predecessor to the present day Water Code, to provide a more orderly way for allocating the

state's unappropriated surface water. The act declared that all the water within the state is the property of the people of the state, but the right to use the water may be acquired by appropriation. (See now Wat. Code, §§ 102, 1201-1202.)[5] A permit system administered by the Water Commission (now the State Water Resources Control Board) became the exclusive means for appropriating water (§§ 1225, 1250 et seq.), but existing appropriations, both statutory (under the 1872 Civil Code) and nonstatutory, were "grandfathered" in under the act. (*People* v. *Shirokow* (1980) 26 Cal.3d 301, 309 [162 Cal.Rptr. 30, 605 P.2d 859].) As in the Civil Code, the act provided that appropriative rights could be lost by disuse. Significantly, a similar provision allowing for the forfeiture of an unexercised riparian right was declared to be unconstitutional. (*Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489 [45 P.2d 972].)

The act also created an in rem statutory procedure for adjudicating the relative rights, riparian and appropriative, of all claimants to the water in a particular stream system. As discussed below, the procedure has since been held to give the State Water Resources Control Board broad authority to limit unexercised riparian rights in order to foster the most reasonable and beneficial uses of the state's scarce water resources. (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339 [158 Cal.Rptr. 350, 599 P.2d 656].)

The policy expressing the preference for reasonable and beneficial uses of water, and extending it to riparian uses in particular, was declared in a constitutional amendment adopted by the people of the state in 1928. The amendment states in part: "The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; . . . ." (Cal. Const., art. X, § 2, formerly art. XIV, § 3.) Thus, while taking care to preserve riparian rights, the amendment abolished that aspect of the common law doctrine which entitled a riparian, as against an upstream appropriator, to enforce his right to the entire natural flow of a stream even if his use of the water was wasteful or unreasonable. (*U.S.* v. *Gerlach Live Stock Co.*, *supra*, 339 U.S. at p. 751 [70 S.Ct. at pp. 968-969]; *Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351 [40 P.2d 486]; *Gin S. Chow* v. *City of Santa Barbara* (1933) 217 Cal. 673 [22 P.2d 5].)

---

[5]All further statutory references are to the Water Code unless indicated otherwise.

## B. *The Borrors' Property.*[6]

The Borrors' ranch consists of numerous contiguous but distinct tracts of land spread across five sections in two townships.[7] Most of the land had already been assembled under one ownership by the time the Borrors bought the ranch in 1936. But the various tracts have different histories which in some instances affect the nature and extent of the Borrors' water rights relative to each.[8]

We begin with the four tracts mentioned in the Poplar decision. Although identified in that decision by full legal descriptions, it is easier for our purposes to refer to them simply by number.

### Tract No. 1 (The Duncan Homestead)

Tract No. 1 consists of the southwest quarter of section 36. It is the portion of the Borrors' land that was originally settled by George Washington Duncan, after whom the Duncan Ditch is named.

The journey that took Duncan to the Springville area of Tulare County was typical in many ways of the early settlement that played such a major role in shaping the state's water law. According to his memoirs, Duncan arrived in Sacramento by wagon train in 1851 as a young man of 19. He spent the next few years working in the gold fields with limited success. Then, in the fall of 1856, he rode south through the San Joaquin Valley to

---

[6]A simplified map prepared from plaintiff's exhibit 5 is attached as an appendix to show the parts of the Borrors' ranch pertinent to this appeal.

[7]When California became a state, federal surveyors divided it into a rectangular grid centered around one of three base and meridian landmarks. Surveys in the central part of the state refer to the Mt. Diablo base and meridian. Each of the townships in the grid is formed by the intersection of township and range lines and is identified by its position relative to this central point. For example, the Borrors' property is in township 20 south, range 29 east and township 21 south, range 29 east, Mt. Diablo base and meridian. A township is approximately 6 miles square and consists of 36 sections, each about a mile square and containing 640 acres. (See Cal. Real Property Sales Transactions (Cont.Ed.Bar 2d ed. 1993) Descriptions of Property, § 9.17, pp. 649-654.) The Borrors own land in sections 26, 35, and 36 of township 20 south, range 29 east and in sections 1 and 2 of township 21 south, range 29 east. Before the construction of the Edison power plant, the Duncan Ditch took water from the river in section 6 of township 21 south, range 30 east. In the interest of brevity, we will refer to these sections by their number alone and omit the rest of the survey description.

[8]These tracts are not necessarily the same as the parcels created by the Tulare County Tax Assessor for property tax purposes. Some of the tracts contain several assessor's parcels. Conversely, a tract that is now a single parcel might once have been made up of several smaller parcels held by different owners. As discussed below, this distinction has a bearing on the Borrors' claim to riparian rights, which extend only to the smallest tract of riparian land held under one title in the chain of title leading to the present owner. (*Rancho Santa Margarita* v. *Vail* (1938) 11 Cal.2d 501, 529 [81 P.2d 533].)

Tulare County. He met up there with a friend who had an interest in a "wayside stopping place" near the present day town of Porterville on the lower Tule River. Soon after he arrived, Duncan and his friend drove a wagon for two days east into the mountains to cut pine shakes. Although he did not realize it at the time, they ended up in the very area where he and his family would settle about 15 years later. In the manner of John Muir, he wrote of the area: "The mountain forest is full of inspiration for me. I do not look for inspiration in the gorgeous temple, listening to the swelling tones of the grand organ. The songs of the birds, the chatter of the chipmunk, the long drawn howl of the wolf, or the mad roar of the mountain stream, these are far sweeter music to me, so call me a child of Nature, for I worship in her temples, and find consolation there. Nature had stored in those mountains, a bountiful supply of fuel, material for lumber, fencing etc., and a fine supply of water to be diverted onto the dry plains, which has been done, and truly, the desert has been made to blossom as the rose, and for ages to come, with proper government protection, those grand mountains will continue to furnish material for our children's children to make beautiful their homes."

Duncan soon left his friend and returned north a short distance to the "Four Creek country" near Visalia where another acquaintance from the mines had settled and begun farming. Duncan bought a claim to some land nearby that was already partially fenced and had a small house on it. He evidently remained there for several years because he cleared and fenced the property, built a barn and granary, "[brought] a ditch of water onto my land," planted a peach orchard, and "raised the first successful crop of potatoes in the county."

Duncan's memoir ends at this point and the record provides no further account of him for the next several years until 1881 when he received a patent for Tract No. 1. According to documents submitted in support of his homestead claim, he and his family had lived on the property continuously since moving there in December of 1873. In describing improvements on the land he stated: "I have a dwelling house, a barn [and] two fruit houses. About 120 to 130 acres of the land is enclosed with a board fence. I have about 20 acres in orchard and vineyard, [and] an irrigation ditch[.] [I] bought the right to this land of Cromwell Axe, about Dec. 1873. Cromwell Axe had resided upon this land [for] 4 or 5 years. He had a house on the land and a vineyard and orchard. I paid Cromwell Axe for his claim [to] this land and for his improvements thereon $2000.00. [unreadable]."

Elsewhere in his homestead proof Duncan claimed to have "broken up and cultivated about 50 acres of this land." The accompanying statements of two witnesses estimated the amount of Duncan's cultivated land at one hundred

acres, on which he reportedly grew wheat, barley, corn, vegetables, and fruit. A government survey map prepared in 1874 placed Duncan's orchard and ditch at the western edge of his property, in the general area where the Borrors' houses and barn are now located. It is difficult to tell from the map just where Duncan's original "irrigating ditch" began and ended, but it does not appear to correspond to the present day Duncan Ditch.

Duncan retained much of his original homestead until 1905 when the entire quarter section was sold in the first of several transactions leading to its purchase in 1907 by one Harry Sickles, who still owned it at the time of the Poplar decision in 1916. Sickles also came to own the other tracts described below that would become the core of the Borrors' ranch. He sold them all in 1927 to Roy Vincent who lost them to the bank three years later. The Borrors leased the property from Vincent in 1930 and bought it together with some additional land from the bank in 1936.

Tract No. 1 is, for our purposes, the most important of the tracts identified in the Poplar decision. Roughly half of it, 70 to 75 acres, is now part of the Borrors' irrigated pasture. The pasture is bounded on the uphill side by the Duncan Ditch, which follows the 1,200-foot contour line along a diagonal path from the southeast to the northwest corner of the property; it is bounded on the downhill side by Highway 190, which runs diagonally through the southwest corner. The Middle Fork of the Tule River flows through the very southwest corner, separated from the pasture by the road.

### Tract No. 2 (The Fauset Property)

Tract No. 2 is the north half of the northeast quarter of section 1, and lies immediately to the south of the original Duncan homestead. It was patented from the United States to George W. Fauset in 1897. The following year, Fauset and one C. E. Brockett purchased a one-sixth interest in the Duncan Ditch from George Duncan. By then, the ditch passed through Fauset's property and then headed north through Duncan's homestead along much the same path it follows today. Fauset sold his homestead in 1904 and it passed three years later into the hands of Harry Sickles, who promptly sold it to Charles A. Elster, who still owned it when the Poplar decision was issued. In 1918, Elster sold the property back to Sickles, who by then owned the rest of section 1.

The very southern end of the Borrors' permanent pasture, amounting to about 12 acres, extends into Tract No. 2 to a point just past the highway, which passes diagonally through the northeast corner of the property. The Middle Fork flows from the southeast to the northwest corner, roughly

parallel to the highway and on the other side of it from the Borrors' irrigated pasture.

### Tract No. 3

Tract No. 3 is the southwest quarter of the southeast quarter of section 35. It was part of a much larger grant of land by the United States to the Southern Pacific Railroad Company in 1880. The railroad divided the southeast quarter into several lots, one of which corresponds to Tract No. 3. George Duncan bought the lot in 1892, and sold it in 1902. Harry Sickles later acquired it in 1911 and was still the owner at the time of the Poplar decision.

Tract No. 3 has relatively little to do with the issues in this case. Although it is identified in Poplar as one of the three tracts open to irrigation by the Duncan Ditch, there is nothing else in the record to suggest that water from the ditch has ever actually been used there. Nor does Tract No. 3 appear to have ready access to the ditch some considerable distance away on the original Duncan homestead. In any event, the Borrors are not now irrigating any part of this property, and evidently they never have. Both the North Fork and Middle Fork flow through Tract No. 3 before merging just beyond the western boundary. Highway 190 runs along the northern edge of the tract.

### Tract No. 4 (The Pedigo Property)

The fourth tract identified in the Poplar decision is the portion of the east half of the east half of section 2 lying east of the center of the Tule River. It is a tall piece of land whose northwest corner has been truncated by the river. Unlike the three other tracts identified in the Poplar decision, this property is *not* entitled to receive water from the Duncan Ditch. It is, however, entitled to water from what is known as the Pedigo Ditch. The Borrors do not irrigate any part of Tract No. 4 from the Pedigo Ditch, and it is not clear whether the ditch even still exists. The tract is significant because the Borrors claim they are entitled to transfer their Pedigo Ditch right to the Duncan Ditch.

The entire east half of the east half of section 2 was patented from the United States to James R. Hubbs in 1893. It consisted then of three smaller parcels: the east half of the southeast quarter, the southeast quarter of the northeast quarter, and the northeast quarter of the northeast quarter. Thomas W. Pedigo acquired the first two of these parcels in 1898 and the third one in 1904. He promptly sold the portion of the third parcel, about 17 acres, lying north and west of the Tule River, leaving him with what we refer to

here as Tract No. 4. After some further exchanges, Harry Sickles acquired the tract in 1911, and still owned it in 1916.

Although the water rights adjudicated in Poplar were expressly limited to these four tracts, the Duncan Ditch was evidently being used even then to irrigate additional lands, and its reach has since been extended still farther by the Borrors. As noted, the Poplar decision was based upon stipulated agreements between the Poplar Irrigation Company and each of the defendants in that case. The company's 1914 agreement with Harry Sickles and Charles Elster (the Poplar stipulation) referred to two additional tracts of land which were then presumably receiving water from the Duncan Ditch but which were inexplicably omitted from the Poplar decision two years later.

### Tract No. 5 (The Borrors' Homeplace)

Tract No. 5 is the east half of the southeast quarter of section 35. It consists of three lots originally created by the Southern Pacific Railroad Company from land granted to it in 1880 by the United States. The railroad sold two of the three lots to George Duncan in 1892. In 1905, Duncan and others sold all three lots, by then merged into the one parcel, to A. G. Wishon who sold it, along with Tract No. 3, to Harry Sickles later that same year.

Tract No. 5 lies immediately to the west of the Duncan homestead. Duncan's original orchard and irrigating ditch, as shown by a government survey map in 1874, straddled the border between the two tracts. Thus it appears Duncan was irrigating a portion of this property while it was still in the public domain. In any event, Sickles was evidently using Duncan Ditch water in Tract No. 5 by 1908. In that year, he and Charles Elster, as the owners of the ditch, signed an agreement permitting them to divert water from the tailrace of a power plant about to be built by the Globe Light and Power Company (and since acquired by the Southern California Edison Company). The agreement identified the two men as the owners of certain property (Tracts No. 1, 2, and 5) as well as of the Duncan Ditch "by means whereof said lands or the greater portion thereof, and other lands, have been and may be irrigated . . . ."

The Poplar stipulation, but not the Poplar decision, provided that Sickles was entitled to use his Duncan Ditch water right to irrigate Tract No. 5, along with Tracts No. 1 and 3. The Borrors currently use the ditch to irrigate all 45 acres in Tract No. 5 lying north of Highway 190, which divides the tract roughly in half. Their homes are also located in this northern irrigated portion. The Middle Fork flows through the southern portion.

*Tracts No. 6 and 7*

The Borrors also own most of the northern half of section 35, and irrigate most of the northeast quarter. This irrigated portion is divided roughly in half by the North Fork of the Tule River, which flows through it in a southwesterly direction. We will refer to the irrigated area east of the river as Tract No. 6, and the area to the west as Tract No. 7 or the "airport property."[9]

The early history of these two tracts is not fully revealed in the record, but like so much of the rest of the Borrors' property, the northern half of section 35 was owned at one time by Harry Sickles. The Poplar stipulation, but not the Poplar decision, provided that Sickles was entitled to use his Duncan Ditch right in the southeast quarter of the southeast quarter of the northeast quarter of section 35. This is a 10-acre square of land in the southeast corner of Tract No. 6 where it adjoins Tracts No. 1 and 5. It is therefore reasonable to assume that at least this portion of Tract No. 6 was receiving water through the Duncan Ditch by 1914. This assumption receives additional support from the 1898 indenture by which George Duncan granted a one-sixth interest in the Duncan Ditch to G. W. Fauset and C. E. Brockett for use in Tract No. 2. The document describes the ditch as originating on the Middle Fork, crossing through Tract No. 2, and going "Thence North westerly to its intersection with North Tule River."[10] It would have been difficult for the ditch to follow such a course without passing through or near the southeast corner of Tract No. 6. The present day Duncan Ditch does in fact cross Tract No. 1 and then heads north through Tract No. 6 before turning west to the North Fork. It followed essentially the same route when the Borrors moved to the property in 1930, and there was evidence back then that part of Tract No. 6 had been irrigated for some time.

Although the Duncan Ditch originally ended in Tract No. 6 at the North Fork, it now crosses the river and has been used by the Borrors since the late 1960's to irrigate an area of about 50 acres west of the river in Tract No. 7, generally referred to as the airport property. This irrigated area extends northward slightly onto property owned by the Borrors in the southeast

---

[9]Thus it appears the Borrors have an unexercised riparian right to irrigate all or some portion of Tracts No. 6 and 7 from the North Fork. The North Fork, however, is smaller than the Middle Fork and typically contains very little water in the summertime.

[10]Any diversions in excess of the amount an appropriator can put to a reasonable beneficial use must be returned to the stream for the benefit of other users downstream. (*Thayer* v. *California Development Co.* (1912) 164 Cal. 117, 137 [128 P. 21]; *Natoma W. & M. Co.* v. *Hancock* (1894) 101 Cal. 42, 51-52 [35 P. 334].) This presumably was the reason the Duncan Ditch extended to the North Fork, so the fact that it did does not necessarily mean it was being used to irrigate all the land along the way.

quarter of section 26. They also irrigate a small, triangular piece of land formed by the Duncan Ditch where it crosses the very southwest corner of the northwest quarter of section 36. The Borrors purchased this property in 1970.

In summary, the Borrors use water from the Duncan Ditch to irrigate roughly 225 acres of permanent pasture in Tracts No. 1 through 7.[11] Only about 87 acres of this pasture fall within the 3 tracts that are entitled, according to the Poplar decision, to receive water from the Duncan Ditch (Tracts No. 1, 2, and 3). Another 90 or 95 acres are located in 2 other tracts that were being irrigated with Duncan Ditch water at the time of the Poplar decision, although perhaps not as extensively as they are now (Tracts No. 5 and 6). The remainder of the pasture, about 55 acres in Tract No. 7, was not put under irrigation until around 1970. The Borrors maintain they have improved the efficiency of the ditch and so are able to irrigate this additional acreage without increasing the amount of water they divert from the river.

## C. *The Poplar Decision.*

The Poplar decision was the resolution of a suit brought by the Poplar Irrigation Company against some 31 upstream water users on the Tule River, based upon stipulations between the company and each of the defendants. The judgment, rendered in September of 1916, typically identifies each defendant either as the owner of certain land along the river or as a shareholder in a ditch diverting water from the river, and then specifies the amount of water the defendant is entitled to take relative to the irrigation company. We are primarily concerned here with paragraph 31 of the decision declaring the rights "As BETWEEN THE PLAINTIFF AND THE DEFENDANTS, GEORGE W. FINK, URIAH J. WEBB, HARRY E. SICKLES AND C. A. ELSTER," and particularly with subdivisions (c) and (d) of paragraph 31 pertaining to the Pedigo and Duncan Ditch rights respectively.

Subdivision (c) identifies Harry Sickles as the owner of Tract No. 4, "which borders upon, and is riparian to" the Middle Fork of the Tule River, as well as the owner of the Pedigo Ditch "which leads out of said Tule River in the Southeast quarter of Section Thirty-Five (35) . . ." (i.e., from Tract No. 3). The decision then declares: "That said defendant Harry E. Sickles is and shall be entitled to divert from said Middle Fork of said River, by means of said Pedigo Ditch, Fifteen (15) miners inches of water measured under a

---

[11]Estimates of the number of acres the Borrors have in irrigated pasture in these seven tracts varies throughout the record, and neither party uses one figure consistently. However, 225 acres is the total used by the parties to calculate the Borrors' irrigation efficiency, a figure which will become important to our review.

Four (4) inch pressure,[12] and use the same upon the land last hereinbefore described, but not elsewhere, for irrigation, domestic and other useful purposes, and for live stock to drink; . . . "

Subdivision (d) identifies Harry Sickles as the owner of Tracts No. 1 and 3, and C. A. Elster as the owner of Tract No. 2, all of which land "borders upon and is riparian to" the Middle Fork. The two men are identified further as the owners of the Duncan Ditch "which leads out of said Middle Fork of said Tule River on the North side thereof, on the North half of Section Six (6) . . . ." Then the decision states: "That said defendants, (in addition to the rights to which they are entitled under the other Subdivisions of this Paragraph of this judgment), are and shall be entitled to divert from said Middle Fork of said River, Ninety (90) miners inches, measured under a Four (4) inch pressure, of the water naturally flowing in said Fork of said River, and use the same upon the lands in this Subdivision of this Paragraph above described, and not elsewhere, except as hereinafter provided,[13] for irrigation, domestic and other useful purposes, and for live stock to drink . . . ." Subdivision (d) goes on to say that Sickles and Elster may divert water into the Duncan Ditch either directly from the river or from the tailrace of the power plant then owned by the Mt. Whitney Power and Electric Company. It concludes by directing: "That said defendants shall allow all the waters of said Tule River, other than the portions thereof which

---

[12]There are two different definitions of a miner's inch. (See generally, 62 Cal.Jur.3d, Water, § 2, pp. 25-27.) Section 24 defines it as follows: "The standard miner's inch of water is equivalent to one and one-half cubic feet of water per minute, measured through any aperture or orifice." But according to Bulletin No. 94-1: "This flow is equal to 1/40 cubic foot per second. A common definition of the miner's inch is the quantity of water flowing through a one-square-inch orifice under a prescribed head. Under a head of 6 inches the flow through the orifice would be about 1/40 cubic foot per second, or the California Statute miner's inch. Under a head of 4 inches the flow would be about 1/50 cubic foot per second [in our case, the result is 1.8 cfs.]." (Bull. No. 94-1, *supra*, p. E-14.) This latter flow is sometimes referred to as the "Southern California" miner's inch. (*Ibid.*) Bulletin No. 94-1 goes on to explain that miner's inches were commonly used in claims for appropriative rights filed prior to passage of the Water Commission Act in 1914. (*Ibid.*) Although some of the other rights adjudicated in the Poplar decision were expressed in miner's inches, only the Pedigo and Duncan Ditch rights specified the pressure under which the water flow was to be measured. The authors of Bulletin No. 94-1 noted that the Southern California miner's inch was the more common standard on the Tule River, but stated: "In view of the above, we conclude that the Southern California miner's inch is the unit which has been used as the measure of the water right in many, but not necessarily all, cases where the miner's inch has been used in the Tule River Hydrographic Unit." (Bull. No. 94-1, *supra*, at p. E-15.)

[13]The decision states that Elster may divert any portion of his share of the water through an existing two-inch pipe leading south from the tailrace of the power plant and that he "shall have the right to use said portion of his share of said water so diverted through said pipe for such purposes, and at such places as he may elect . . . ." Sickles and Elster owned undivided interests in the Duncan Ditch equal to $69/90$ and $21/90$, respectively. Elster's share of the Poplar allotment, in other words, was 21 miner's inches.

they are entitled to divert and use as aforesaid, and all portions of said water which they are entitle[d] to divert and use as aforesaid, but which they may not be using, when they are not using the same, as hereinbefore provided, to flow down said River for the use and benefit of said plaintiff."

Paragraph 32 of the decision requires all defendants to install devices to measure water flow in their ditches at or near the point of diversion, and to maintain the ditches and diversion works in good order. It provides further "[t]hat none of said defendants shall suffer or permit any unnecessary loss or waste of any water."

Paragraph 33, pertaining to the rights "As BETWEEN PLAINTIFF AND ALL THE DEFENDANTS," states in part: "That the right of the several defendants hereinbefore mentioned to take the several quantities of water hereinbefore, and in this judgment, and the several paragraphs thereof, awarded to them respectively, for the uses and purposes hereinbefore specified, is prior and superior to the right of the plaintiff to take and divert from said Tule River, and to use of the waters naturally flowing in said River, the quantity hereinafter mentioned."

Finally, the decision provides that the Poplar Irrigation Company is entitled to divert water from the river at a specified rate "subject to the rights of said several defendants to divert the quantities of water awarded to them respectively in the foregoing paragraphs of this judgment, for the uses and purposes in this judgment specified, and subject to said rights only . . . ."

The Poplar decision also determined the rights of Pleasant Valley's predecessor, the Pleasant Valley Ditch Company, relative to the Poplar Irrigation Company. The decision identified several individuals who owned land served by the Pleasant Valley Ditch, "some of which lands are riparian to said Tule River," and then provided: ". . . that all of said defendants are and shall be entitled to divert by means of said Pleasant Valley Ditch from said Tule River, Five (5) cubic feet per second, but no more, of the waters naturally flowing in said River, and to use the same for irrigation and domestic purposes, and for live stock to drink, upon their said lands, or the lands of the stock holders of said corporation, Pleasant Valley Ditch Company . . . ."

While Pleasant Valley asserts the Borrors' water rights are fixed by the Poplar decision, it relies on a different case for its own rights. In 1933, Claude Jones and other owners of the Crabtree-Akin Ditch brought an action to determine their rights as against Pleasant Valley and other upstream appropriators and riparians on the Tule River (not including the Borrors' predecessors). The Jones decision identifies certain of the defendants as

owners of the "Wheat and Baker Right" entitling them, as against the plaintiffs, to divert 2.5 cubic feet of water per second through the Pleasant Valley Ditch. Pleasant Valley itself, as the owner of the ditch, was held to have the right as against the plaintiffs to divert 3.5 cubic feet per second (cfs). Accordingly, Pleasant Valley claimed in its complaint in this action to have the right as against the Borrors to divert 6 cfs through its ditch.[14] Elsewhere in the litigation, it has claimed to have additional rights to 25 and 35 miner's inches of water, 0.625 and 0.875 cfs respectively, bringing its total allotment to 7.5 cfs.[15] In its allocation agreement with the Graham-Osborn and Mt. Whitney ditch companies, Pleasant Valley agreed to a proportionate reduction in its diversions when flows in the Tule River were insufficient to supply it with 6.5 cfs of water.

### D. The Borrors' Water Use.

The Duncan Ditch heads west from the Edison tailrace into the northeast corner of Tract No. 2, then northwesterly through Tract No. 1 on into Tract No. 6, and finally west again across the North Fork into Tract No. 7. For most of this way, it follows the 1,200-foot contour line along the uphill side of the Borrors' permanent pasture. Water is distributed to the pasture through laterals leading downhill from the ditch. Each lateral contains several irrigation valves. The land is "somewhat hummocky or undulated" with a "relatively steep" slope and shallow soil. Consequently, some water runs off the pasture on the downhill side. Some of the runoff in Tracts No. 1 and 5 flows in culverts under Highway 190 back to the Middle Fork. Most of the rest flows into the Mt. Whitney Ditch, which crosses the two tracts along the same general path as the highway. The Mt. Whitney Ditch then heads north into Tract No. 6 and across the North Fork into Tract No. 7 before turning southwesterly back toward Springville. At the point where the Mt. Whitney Ditch crosses the North Fork, the Borrors spill some of the water back into the river to compensate for the runoff they have added to the ditch.

The parties' experts gave conflicting opinions about whether this method of flood irrigation is reasonable, and particularly about whether a sprinkler

[14]According to Bulletin No. 94-1: "The increase of one cubic foot per second over the amount permitted under the judgment in [Poplar] resulted from purchase of water rights by Pleasant Valley Canal Company in the 17-year interval between the two decrees." The bulletin provides no further information about these later-acquired rights, nor does Pleasant Valley.

[15]Pleasant Valley claims ownership of the Volney-Baker right to divert " 'enough water to irrigate 55 acres' " which has been found by some undisclosed method to be the equivalent of 25 miner's inches measured under the statutory or "Northern California" standard. And, in 1988, Pleasant Valley acquired the right to divert up to 35 Northern California miner's inches under the Rose Ditch water right. Their purchase of the Rose Ditch right is the subject of some controversy, as we discuss below.

system, acknowledged to be more efficient, would be practical or economical under the circumstances. The trial court concluded the Borrors' existing irrigation practices, although somewhat antiquated, are reasonably efficient. Pleasant Valley does not challenge this conclusion on appeal, so we need not decide the issue. But it will be helpful to our discussion of other issues to briefly review the subject of irrigation efficiency.

The Poplar decision held that, as against the Poplar Irrigation Company at least, the Borrors' predecessors were entitled to divert 90 miner's inches, or 1.8 cfs of water through the Duncan Ditch to irrigate land in Tracts No. 1, 2, and 3. The Borrors irrigate about 87 acres within these 3 tracts. They also irrigate additional land in Tracts No. 5, 6, and 7 bringing the total to 225 acres. For these 225 acres they divert about 4 cfs of water during the summer months, the same amount they claim they have been using since the 1930's. They divert less water during other times of the year, but we are concerned here only with the maximum amount of water they are entitled to take from the river.

Cubic feet per second is a measure of the rate of flow of water into the ditch rather than the amount of water used on the land, commonly expressed in acre-feet. Water flowing at the rate of 1 cfs will yield 1.9835 acre-feet per day, or about 61.5 acre-feet per month. Irrigated pasture requires about eight inches, or two-thirds of an acre-foot of water per month. Irrigation efficiency refers to the percentage of the water applied to a field that is actually utilized by the plants (the remainder being lost to runoff, evaporation, or percolation beyond the root zone). Thus, with a delivery system operating at 70 percent efficiency, it is necessary to apply 11.43 inches of water per acre of pasture (8 ÷ 0.70 = 11.43). In addition, some water is lost in the ditch between the points of diversion and application. In this case the loss was assumed to be 5 percent, meaning 95 percent of the water diverted at the Edison tailrace reaches the Borrors' pasture. Therefore, if their irrigation efficiency were 70 percent, the Borrors would have to divert 12.03 inches of water, or about 1 acre-foot per month during the summer months for each acre of irrigated pasture (11.43 ÷ 0.95 = 12.03). To irrigate the 87 acres covered by the Poplar decision, they would need to divert water into the Duncan Ditch at the rate of 1.41 cfs (1 acre-foot/acre × 87 acres ÷ 61.5). Similarly, it would require 3.66 cfs to irrigate all 225 acres of permanent pasture on the ranch.

Bruce Borror testified the ranch has been diverting about 4 cfs on average into the Duncan Ditch for as long as he can remember, a flow which

represents an irrigation efficiency of about 64 percent.[16] The Borrors' records for 1992, 1993, and 1994 indicate their actual diversions for the months of May through August in those three years ranged from 2.75 to 4.49 cfs and averaged 3.69 cfs.[17]

## II. Discussion

### The Borrors' Appeal

■ The Borrors challenge the judgment in several respects. Their principal contention is that, contrary to the trial court's conclusion, the Poplar decision's declaration of their predecessors' water rights as against the Poplar Irrigation Company is not determinative of their own rights as against Pleasant Valley, or at the very least it is not determinative of *all* their rights. As we shall explain, we agree that the Poplar decision is not binding in the present context, but conclude that it provides persuasive evidence of the historic use of water on the Borrors' property, and consequently of their water rights as they existed in 1916.

### A. *The Preclusive Effect of the Poplar Decision.*

The trial court concluded the Borrors' water rights in the Duncan Ditch are limited to those adjudicated in the Poplar case. The judgment states in part:

"1. The 1916 decision of the Tulare County Superior Court, case no. 7004, entitled Poplar Irrigation Company vs. Howard, et al., established a comprehensive allocation of the water rights of the various parties in that lawsuit to use water from the Tule River. Those water rights included any riparian,

---

[16]Bruce Borror was a boy of about six years old when his family moved to the ranch in 1930. He testified his father and uncle were then irrigating Tracts No. 5 and 6 as well as the three Poplar tracts, and estimated the total irrigated pasture in these five tracts to be about one hundred seventy-five acres. If, as he said, they were diverting 4 cfs for this purpose, their irrigation efficiency would have been only about 50 percent. But, according to Borror, they have since improved the efficiency by adding about four miles of plastic pipe to the ditch and so were able to extend it into Tract No. 7 in order to irrigate two hundred twenty-five acres with the same amount of water.

[17]The Borrors' expert, Stanley Barnes, utilized the diversion records to calculate irrigation efficiency by a different method than the one just described. He testified irrigated pasture requires 51.5 inches of water per acre per year. Of this amount, 5.1 inches on average is supplied by rainfall during the growing season and 3 inches by residual root zone moisture, leaving 43.4 inches or 3.62 acre-feet to be supplied by irrigation. The Borrors diverted an average of 6.77 acre-feet per acre per year from 1992 through 1994. Therefore, their irrigation efficiency was just 53 percent ($3.62 \div 6.77$). Nonetheless, he agreed that the maximum amount the Borrors need to divert during the summer growing season, the critical figure for purposes of evaluating their water use, is about 1 acre-foot per acre per month or 3.7 cfs.

appropriative or prescriptive water rights that may have existed at the time of the 1916 decision.

"2. The defendants in this case are the successors-in-interest to and are bound by the water rights allocated in the Poplar decision to Sickles and Elster, as provided in paragraphs 31(c) and (d) of that Poplar judgment. No water rights of any kind have been established in favor of the defendants which are separate or additional to the water rights allocated to the defendants' predecessors-in-interest in the Poplar decision.

"3. As a result of the foregoing, the defendants Bruce Borror and Sequoia Ranch Estates are allowed to divert from the Middle Fork of the Tule River 90 miner's inches, or 1.8 cubic feet per second, but no more. This water may be used in a reasonable and beneficial manner on the following-described property (the subject property), but not elsewhere: [legal descriptions of Tracts No. 1, 2, and 3]."

Although the Poplar case adjudicated the rights of the Poplar Irrigation Company with respect to numerous upstream water users, there are as many other users who were not parties to the action. Moreover, the decision does not purport to determine the rights of the various codefendants as among themselves. In short, the Poplar decision suffers from the inherent inability of private lawsuits to provide just the sort of "comprehensive allocation" of water rights attributed to it by the trial court. As our Supreme Court has noted, "This method of resolving controversies involving the rights of the users of water on the river is necessarily piecemeal, unduly expensive and obviously unsatisfactory." (*Meridian, Ltd.* v. *San Francisco* (1939) 13 Cal.2d 424, 457 [91 P.2d 105].) It is just these sorts of shortcomings that a statutory streamwide adjudication is designed to overcome. (See *In re Waters of Long Valley Creek Stream System*, *supra*, 25 Cal.3d at pp. 347-348, 354-357.)

For its survey of water use in Bulletin No. 94-1, the Department of Water Resources relied principally on three superior court decisions adjudicating water rights in the Tule River: the Poplar case, the Jones case described above, and the Glover case.[18] The bulletin notes some of the limitations and problems with using these cases in an effort to reach a streamwide allocation of water.

---

[18]In 1910, L. N. Glover and several other riparian owners on the lower Tule River sued T. J. Mitchell and numerous other upstream riparians and appropriators to establish a 22-day "riparian run" in the spring of each year during which the defendants generally were prohibited from making any diversions from the river. The decision also limited the defendants' diversions during the rest of the year: the riparians to reasonable uses, and the appropriators to the carrying capacities of their respective ditches. The Pleasant Valley Ditch Company, as one of the defendants, was determined to have the capacity to divert 13.64 cfs

"Water rights in the Tule River Hydrographic Unit are based primarily upon riparian status and upon appropriation, as further delimited by private agreements and adjudications. Three major suits, [Glover, Poplar, and Jones], have defined the rights of a number of the present water users in the area, but the rights of each user as against each of the other users have not been determined.

"The three suits involved some common parties, but a number of present water users or their predecessors were not named in any of the suits. Of the 69 diversions reported in Table 3,[19] the owners of 14 were parties of the *Glover* case and 28 were parties to the *Poplar Irrigation Company* case, and 11 were parties to the *Jones* case. Technically the decreed rights apply as between plaintiff and defendants of a particular case only, and therefore the rights established by one suit do not necessarily supplement or supersede

through its ditch. Harry Sickles and Charles Elster, then the owners of the Duncan Ditch, were not parties to the suit.

[19]Table 3 of Bulletin No. 94-1 provides information about each of the 69 diversions the Department of Water Resources was able to identify within the Tule River hydrographic unit during the 1957 water year. The information includes the extent and method of use, the type, amount and source of the user's "apparent water right," the date of appropriation or first use, and a description of the diversion system. According to table 3, the Duncan Ditch was first used in "[a]bout 1860"; its owners have an "adjudicated" right to divert 90 miner's inches of water pursuant to the Poplar decision; and the ditch was being used in 1957 to flood irrigate 120 acres of land. Table 3, in turn, refers to a series of topographic maps showing the location of each diversion and the area irrigated. The irrigated area shown on these maps within the Borrors' property, estimated by the department to contain 120 acres, appears to be the same area in Tracts No. 1, 2, 5, and 6 said by the Borrors to be about 175 acres. The bulletin does not explain its source for the date of appropriation assigned to the Duncan Ditch. With regard to the "apparent water right" shown in the table, the bulletin states generally:

". . . The determination of this item is based upon the best information available from the owner, from files of the State Water Rights Board, from court decrees and other official records, and from other sources. The actual amount of the right, if established and known, and a reference to the source of data are also included. Although this information is believed to be accurate, it is emphasized that it is not based on sworn claims or testimony and should in no way be construed to represent a conclusive determination of water rights.

"Diversions for which water rights have been adjudicated are listed in Table 3 as 'adjudicated'. Those based on appropriative rights which have not been adjudicated, are listed as 'appropriative'. Those neither adjudicated nor appropriated, for which the area of use is apparently riparian are listed as 'riparian'. Diversions listed as adjudicated or appropriative may also be riparian, although no attempt was made in such cases to determine the riparian status." In its statement of decision, the trial court stated: "I have placed significant weight on the interpretation of Bulletin 94 and find that defendants are presently entitled to irrigate up to 120 acres on the parcels specified in the *Poplar* decision. I find that 1.8 cubic feet per second may not be adequate to do that with permanent pasture during months of peak demand. Nonetheless, *Poplar* allows no more water to be used, unless, of course it is water purchased from another, surplus water, or groundwater." In light of our conclusion that the Borrors are not bound by the Poplar decision, or by the Department of Water Resources' interpretation of it, we need not consider their claim that the trial court's reliance on Bulletin No. 94-1 was misplaced.

those of a previous suit. . . . It may be noted that for some of the water users who were parties to more than one suit, there are variations between the decreed entitlements. . . ." (Bull. No. 94-1, *supra*, pp. D-11 to D-12.)

■ "[I]t is fundamental as to the doctrine in *res judicata* that before the former adjudication may operate as an estoppel as to issues in the later action, there must be an identity of parties, as well as an identity of issues." (*Standard Oil Co. v. J. P. Mills Organization* (1935) 3 Cal.2d 128, 139 [43 P.2d 797].) "The parties are deemed to be the same when those between whom the evidence is offered were on opposite sides in the former case, and a judgment or other determination could in that case have been made between them alone, though other parties were joined with both or either." (Code Civ. Proc., § 1910.) "Ordinarily, therefore, where the plaintiff and defendant in the subsequent action were merely codefendants in the original action, the prior judgment cannot be used by one against the other as an estoppel since they were not adversary parties in the original action and no issues were raised or adjudicated *between* them therein." (*Great Western Furniture Co. v. Porter Corp.* (1965) 238 Cal.App.2d 502, 509 [48 Cal.Rptr. 76].)

However, as Pleasant Valley notes, coparties to an action may in some situations have adverse interests even where no issue is framed between them by the pleadings. " 'Co-parties who are not adversaries, may be bound by a judgment in a subsequent controversy between each other where they, in fact, occupied, in the prior trial, the attitude of adversaries. . . . [T]he formal arrangement of parties on the record is unimportant, so that if co-parties on the record were, in fact, adversaries on an issue, and the issue was actually litigated, and they had full opportunity to contest it with each other . . . , co-parties are concluded by adjudication of that issue in a subsequent controversy between each other. [Citation.]' " (*Freightliner Corp. v. Rockwell-Standard Corp.* (1969) 2 Cal.App.3d 115, 118-119 [82 Cal.Rptr. 439].)

The plaintiffs in *Freightliner* sued for injuries suffered when their car collided with a truck-trailer equipped with a suspension system manufactured by the Rockwell-Standard Corporation and installed by the Freightliner Corporation. Both were found to be negligent. In the subsequent trial of their cross-complaints against one another for indemnification, each was granted summary judgment on the basis of this earlier finding. Thus the question on appeal was whether their positions in the previous proceeding were sufficiently adverse that the doctrine of collateral estoppel should be applied to bar the cross-complaints. The court concluded they were. It noted that the codefendants in a personal injury action have both the incentive and the

opportunity to show that the other is responsible for the plaintiff's damages. Both Freightliner and Rockwell had taken full advantage of this opportunity. "Therefore, since the issues as to the negligence of both parties were fully litigated in the trial of the main action, the doctrine of collateral estoppel should apply to preclude them from having an opportunity to relitigate them." (*Freightliner Corp.* v. *Rockwell-Standard Corp., supra,* 2 Cal.App.3d at p. 119.)

The same is not true in the present case. The predecessors in interest to Pleasant Valley and the Borrors did not actually litigate any issues adversely to one another in Poplar. Indeed, the Poplar decision expressly limits its application to the water rights as between the Poplar Irrigation Company and each individual defendant.[20] "That only is deemed to have been adjudged in a former judgment which appears upon its face to have been so adjudged, or which was actually and necessarily included therein or necessary thereto." (Code Civ. Proc., § 1911.)

The only other case cited by Pleasant Valley in support of its position has no direct application to the matter before us. The case was concerned with whether the amount of a default judgment against the driver of a car involved in an accident established the upper limit of recovery against the driver's employer sued under the theory of respondeat superior. (*Ponce* v. *Tractor Supply Co.* (1972) 29 Cal.App.3d 500 [105 Cal.Rptr. 628].)

The Borrors are not bound in this case by the Poplar decision for the even more fundamental reason that the issue here is not the same as the one adjudicated in Poplar. The Borrors' rights with respect to the Poplar Irrigation Company are not necessarily the same as their rights with respect to Pleasant Valley. This follows from the fact that water rights as between two appropriators, and even in some circumstances as between an appropriator and a riparian, are based upon their relative priority in time. A water user whose right accrues before one neighbor but after another does not have the same right with respect to both when there is insufficient water in the stream to meet all their needs. The problem of determining the relative priorities of neighboring water users is all the more evident in the present situation where

---

[20]It is worth noting that both the Jones and Glover decisions include even more explicit language recognizing the limited effect of those decisions. The Glover decision, for example, concludes: "And it is further ordered, adjudged and decreed that this judgment is not intended, nor does it in any manner determine the several rights of the respective defendants, among themselves, in or to any of the waters of said Tule River, as riparian proprietors, or appropriators, or otherwise, nor to the use of said waters among themselves, but this judgment is intended to, and does only determine the rights to the waters and the use of the waters, of Tule River and its branches between the plaintiffs on the one part, and the defendants on the other." The Jones decision includes a similar statement.

Pleasant Valley's claim to 7.5 cfs of water consists of at least five separate rights that presumably accrued at different times.

Pleasant Valley's principal argument in favor of holding the Borrors to their Poplar rights is framed in terms of fairness and the public interest. It argues the Tule River water community has come to rely on Bulletin No. 94-1 and, by extension, on the Glover, Poplar, and Jones decisions as having effectively settled water rights along the river. It would be unfairly disruptive, Pleasant Valley maintains, to change the rules of the game at this late date.

■ Although a party to an action is ordinarily estopped to relitigate an issue decided against it in an earlier proceeding, "when the issue is a question of law rather than of fact, the prior determination is not conclusive either if injustice would result or if the public interest requires that relitigation not be foreclosed." (*Consumers Lobby Against Monopolies* v. *Public Utilities Com.* (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41]; *City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51, 64 [266 Cal.Rptr. 139, 785 P.2d 522].) Pleasant Valley would have us turn this "injustice/public interest" exception on its head to bar the Borrors from litigating an issue that has *not* been decided against them. Even if it were possible to overcome the obvious due process problems with their approach, this would not be an appropriate case in which to apply the new rule. Until this controversy arose in 1990, the Borrors had openly diverted more than twice their Poplar allotment of water for 50 years without any apparent harm to or complaint from their neighbors. Pleasant Valley's argument in favor of preserving the status quo does little to bolster its position.[21]

Although the Poplar decision is not a conclusive determination of the Borrors' water rights in relation to Pleasant Valley, it is a useful starting

---

[21]Pleasant Valley's position is weakened even more by its earlier interpretation of the Poplar decision in another context. In 1987, Pleasant Valley contracted with the Charter Company to purchase the right to divert 35 miner's inches of the amount (1 cfs) allotted in Poplar to the Crabtree-Aiken Ditch. In 1988, upon discovering that the Charter Company "did not have sufficient water rights in the Crabtree-Aiken Ditch to support this conveyance," the parties substituted the right to divert the same amount of water under the Rose Ditch right, held in Poplar to amount to 5.5 cfs. In the case of both the Rose Ditch and the Crabtree-Aiken Ditch, the Poplar decision identified the holders of the water rights as the owners of certain lands "bordering upon, and riparian to" the Tule River, and limited them to using the water on that land "but not elsewhere." Thus, Pleasant Valley's transfer of the Rose Ditch right to its own ditch was an appropriative use and something it would not be entitled to do under the interpretation of Poplar it now seeks to apply to the Borrors.

For this reason, and another discussed below, the Borrors contend Pleasant Valley should have been barred under the doctrine of unclean hands from maintaining this action against them. (See generally, 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 8, p. 684.) For reasons that will appear, it is not necessary for us to consider this contention any further.

point. Especially to the extent it corresponds to the Poplar stipulation, the decision provides persuasive evidence of the amount of water being diverted through the Duncan Ditch in 1916, the areas where the water was being used, and the nature of the Duncan Ditch right. With these issues in mind, we turn next to a more thorough examination of the decision.

## B. *The Duncan Ditch Rights Adjudicated in Poplar.*

Pleasant Valley alleged in its complaint that the Duncan Ditch rights adjudicated in Poplar were appropriative in nature, but then switched its position and argued at trial that they were riparian. The Borrors maintained their Poplar rights were appropriative only and the decision did not affect their riparian rights. The trial court concluded Poplar adjudicated *all* Duncan Ditch water rights of whatever sort; that the Borrors' predecessors had "bargained away" any other rights they may have had at the time; and that the Borrors had acquired no additional rights since then. However, the judgment also stated: "At the time of trial, the defendant had 87 acres of pasture under irrigation within the boundaries of the subject property described above [in Tracts No. 1, 2, and 3]. The court reserves jurisdiction to determine whether or not the defendants may have any further rights to riparian use of the Tule River in the event they wish to develop any additional acreage within the boundaries of the subject property described above. At the present time, such future allocation of riparian water would be in accordance with the mandate of Waters of Long Valley Creek Stream System v. Ramelli (1979) 25 Cal.3d 339, 362 . . . ." Thus, the court evidently concluded that the Borrors' predecessors had not bargained away their unexercised riparian rights.

The Borrors are left with what Bulletin No. 94-1 terms an "adjudicated" water right. This characterization however, leaves several important questions unresolved, especially where, as here, the former adjudication is not binding on the parties in their present configuration. These questions include: May the Borrors use their Duncan Ditch water in areas other than Tracts No. 1, 2, and 3? May they use their Pedigo Ditch right in the Duncan Ditch? What is the extent of their riparian right? To find answers to these questions, it is necessary to determine what types of rights the Borrors' predecessors had in 1916.

George Duncan's diversion of water unquestionably began as an appropriation. By his own account, Duncan settled with his family in Tract No. 1 in 1873 and took water from the Middle Fork to irrigate a 20-acre orchard and vineyard and about 50 acres of cultivated land. Both his irrigated lands and the diversion point for his "irrigating ditch" were situated on the public domain. In 1881, when Duncan received a homestead patent for Tract No. 1,

he acquired a riparian right in addition to the appropriative right that had already accrued by virtue of his previous diversion and use of water.[22] In 1892, Duncan purchased additional property in Tracts No. 3 and 5 from the Southern Pacific Railroad Company along with the riparian rights that were "part and parcel" of the land. In 1898, he sold a one-sixth interest in the Duncan Ditch to George Fauset, the owner of Tract No. 2, and to C. E. Brockett. By then, the ditch followed its present day course through the corner of Tract No. 2, across Tract No. 1, and into Tract No. 6 to the North Fork. Tract No. 6, or some portion of it, was riparian to the North Fork but not to the Middle Fork of the Tule River.[23]

In 1906, Harry Sickles, who then owned most of the present day Borror ranch, sold to A. G. Wishon a 40-foot-wide strip of land across parts of Tracts No. 1, 2, and 5 for a "wagon road." This is significant because the strip evidently became Highway 190, at least where the highway crosses through Tracts No. 1 and 5 and separates the Borrors' pasture from the Middle Fork. The sale thus arguably acted as a severance to deprive the pasture of its status as riparian land. Whether it did or not was a question contested at trial, but one which the trial court did not expressly decide.

Therefore, by 1914 when they entered into the Poplar stipulation, Harry Sickles and Charles Elster had between them some blend of appropriative and riparian rights with respect to Tracts No. 1, 2, and 3—the tracts held in the Poplar decision to be entitled to water from the Duncan Ditch. As noted above, the Poplar stipulation, but not the Poplar decision, would have extended the Duncan Ditch right into Tract No. 5 and to a 10-acre area in the corner of Tract No. 6. This and other evidence already discussed suggests that Duncan Ditch water was being used in these areas as well.

Pleasant Valley offered the expert testimony of Richard Schafer, a licensed civil engineer, in support of its position that the Duncan and Pedigo Ditch rights adjudicated in the Poplar case were riparian in nature.[24] Schafer based his conclusion to that effect on two phrases which appear throughout

---

[22]"The granting of a patent to a settler on public lands is held to relate back to the filing of the entry of the land in the United States land office and to confer the rights of a riparian owner upon the grantee of the patent from the date of his entry." (*Haight* v. *Costanich* (1920) 184 Cal. 426, 430 [194 P. 26].)

[23]The owner of land contiguous to one branch of a stream has no riparian right to take water from another branch. "Where two streams unite, we think the correct rule to be applied, in regard to the riparian rights therein, is that each is to be considered as a separate stream, with regard to lands abutting thereon above the junction, and that land lying within the watershed of one stream above that point is not to be considered as riparian to the other stream." (*Anaheim Union Water Co.* v. *Fuller* (1907) 150 Cal. 327, 330-331 [88 P. 978].)

[24]The Borrors moved *in limine* to preclude Mr. Schafer from giving his opinion on the correct interpretation of the Poplar decision, or on any other question of law. The court denied the motion on the basis that the subject of water rights is "a combination certainly of law, of

the Poplar decision, either of which is sufficient in his opinion to establish a water right as riparian. The first identifies the water user as the owner of certain land that "borders upon, and is riparian to" the Tule River and the second limits use of the water to that land "but not elsewhere." Both of these phrases are used in the Poplar decision, and in the Poplar stipulation, to describe the Duncan and Pedigo Ditch rights.

Schafer's reliance on Poplar's reference to "riparian" land is misplaced. It is not always the case that the use of water on a riparian parcel is an exercise of a riparian right. ■ "It is established in California that a person may be possessed of rights as to the use of the waters in a stream both because of the riparian character of the land owned by him and also as an appropriator." (*Rindge* v. *Crags Land Co.* (1922) 56 Cal.App. 247, 252 [205 P. 36].) Such a situation might arise, as it did with the Duncan homestead, where a settler diverts water on the public domain and thereby acquires a right to appropriate as much of it as he or she puts to a beneficial use within a reasonable time. An appropriative right acquired in this way is superior to the right of a riparian owner who subsequently obtains title to public land from the government. (*Haight* v. *Costanich, supra,* 184 Cal. at p. 430.)

Here, George Duncan, after his appropriation of water through the Duncan Ditch, was granted a homestead patent to the land where he had been using the water, which land was itself riparian to the Tule River. He thereby acquired a riparian right subject to any prior appropriations on the public domain, including his own. Pleasant Valley's position would seem to be based on the notion that Duncan's prior appropriative use was somehow transformed into a riparian one when he gained title to the land. The cases do not support this premise. (*Healy* v. *Woodruff* (1893) 97 Cal. 464 [32 P. 528]; *Rindge* v. *Crags Land Co., supra,* 56 Cal.App. at p. 252.)

Schafer's conclusion is further undercut by the fact that some of the property identified in Poplar as. "bordering upon and riparian to" the Tule River was not actually riparian as that term is used to define a water right. ■ The scope of the right is determined by three factors: (1) except in certain circumstances, the right applies only to land contiguous to the stream, (2) it applies only to the smallest tract held under one title in the chain of title leading to the present owner, and (3) it applies only to land within the watershed of the stream. (*Rancho Santa Margarita* v. *Vail, supra,*

---

sociology to some extent, history, and obviously engineering. And it's awful hard to draw the line sometimes between legal conclusions and conclusions that maybe are not so legal." The court subsequently overruled the Borrors' objections to Schafer's trial testimony on essentially the same rationale. As it turned out, the court did not entirely accept Schafer's interpretation of Poplar. Nor do we. Consequently, the Borrors have no cause to complain about the denial of their motion.

11 Cal.2d at pp. 528-529; Hutchins, The Cal. Law of Water Rights, *supra*, pp. 196-203.) Some parts of George Duncan's original homestead (Tract No. 1) do not satisfy the second requirement. In 1893, Duncan sold the southeast quarter to W. E. Hannaford, who sold it back to him a few months later. Duncan sold the same parcel again in 1902 to Laura Anderson. And in 1900, he sold the northwest quarter of the northwest quarter to L. E. "Haniford [*sic*]." Then, in 1905, Duncan, Anderson, and Hannaford sold all of Tract No. 1 to D. L. Wishon, leading to its acquisition two years later by Harry Sickles. The Anderson and Hannaford portions of Duncan's homestead, consisting of about 50 acres and containing some of the Borrors' irrigated pasture, were not contiguous to the Tule River. Nor did they regain their riparian status by being reunited under one ownership with the rest of the original homestead. (*Miller & Lux* v. *James* (1919) 180 Cal. 38, 51 [179 P. 174].) Consequently, although Tract No. 1 borders the Tule River, the irrigation of some parts of it is an appropriative use and has been since before the Poplar decision.

Thus, it appears the "borders upon and is riparian to" language in Poplar was intended merely to describe the land where a particular water right was being exercised, but not to determine the nature of the right itself. Several other aspects of the Poplar decision also support this conclusion. For example, some defendants identified as the owners of land bordering the river were permitted to divert water for storage on their land (Poplar, *supra*, ¶¶ 8, 19). The seasonal storage of water is a nonriparian use. (*Colorado P. Co.* v. *Pacific G. & E. Co.* (1933) 218 Cal. 559, 564-565 [24 P.2d 495]; Hutchins, The California Law of Water Rights, *supra*, pp. 246-247.) Other "riparian" owners, including the Borrors' predecessor, Charles Elster, were permitted to use their Poplar allocation wherever they wished (Poplar, *supra*, ¶¶ 3, 31(d)). But a riparian right may be exercised only on the owner's riparian land. (*Holmes* v. *Nay* (1921) 186 Cal. 231, 235 [199 P. 325]; Hutchins, The Cal. Law of Water Rights, *supra*, pp. 252-253.)

It is this latter restriction that provides the second basis for Richard Schafer's conclusion. He characterized the language in Poplar limiting a defendant's water use to a particular piece of land *but not elsewhere* as indicative of a riparian right. However, several defendants whose land is not identified as riparian, including some who seem clearly to be appropriators, are nonetheless limited to using their Poplar allocation on their land specifically described in the decision, "but not elsewhere" (Poplar, *supra*, ¶¶ 6, 13, 14, 16, 18(b), 21, 24). When confronted with these inconsistencies, Schafer was forced to admit that "there are deviations in the language throughout the judgment." We can only speculate about the purpose of the "not elsewhere" language in Poplar, but it cannot reasonably be interpreted to mean what Schafer says it does.

On the other hand, Poplar's water allocations have some distinctive characteristics peculiar to appropriative rights, and incompatible with riparian rights. Most significantly, the decision awards each defendant a specific amount of water, and provides that the right of the defendant to divert this amount is "prior and superior to" the right of the Poplar Irrigation Company, a junior appropriator. ■ Unlike riparian owners, appropriators have the right to a specific quantity of water as between themselves based upon the principal of "first in time, first in right." An appropriative right,

". . . is not a correlative right in the sense that all rights in a common supply would be considered coequal and that in the event of a water shortage all holders would share alike in the reduced supply. The principle of priority . . . came into acceptance for the express purpose of safeguarding the right of the first appropriator, in just such eventuality, to make full use of the quantity of water that he had appropriated.

"The right of priority therefore attaches to the definite quantity of water that the appropriator has put to reasonable beneficial use in consummating his appropriation. As against junior claimants, he is entitled to divert that quantity whenever it is available in excess of the quantities required to satisfy rights prior to his own, provided that he needs it all. And however great his needs, he is limited to that quantity." (Hutchins, The Cal. Law of Water Rights, *supra*, p. 132.)

■ A riparian owner, by contrast, ". . . has no right to any mathematical or specific amount of the water of a stream as against other like owners. He has only a right in common with the owners to take a proportional share from the stream—a correlative right which he shares reciprocally with the other riparian owners. No mathematical rule has been formulated to determine such a right, for what is a reasonable amount varies not only with the circumstances of each case but also varies from year to year and season to season. . . ." (*Prather* v. *Hoberg* (1944) 24 Cal.2d 549, 560 [150 P.2d 405].) Consequently, "[t]he moment a right in a natural stream is specifically defined in a concrete inflexible amount, at that moment the right becomes one of priority and not riparian." (*Seneca C. G. M. Co.* v. *Gt. Western Power Co.* (1930) 209 Cal. 206, 220 [287 P. 93, 70 A.L.R. 210].)

As against an appropriator, a riparian owner is entitled to the full flow of the stream. Since the state Constitution was amended in 1928, the right has been limited to the amount of water presently being put by the riparian owner to a reasonable beneficial use. Prior to 1928 however, the rule of reasonableness did not apply and "[a]s to a nonriparian owner the riparian owner [was] under no duty to share the waters of the creek." (*Pabst* v. *Finmand* (1922) 190 Cal. 124, 132 [211 P. 11].) Therefore, at the time of the Poplar decision in 1916, ". . . it was the rule that the right of a riparian

owner to water should not be limited to any fixed quantity, since he had the right to all the waters in the stream except as decreased by the reasonable use of other riparian proprietors or by the rights of prior appropriators." (62 Cal.Jur.3d, Water, § 173, p. 200.)

A riparian right also extends to the future reasonable beneficial uses of water. For this reason too, " '[a]s against an appropriator, a riparian owner is accorded a fixed priority of right. But the quantity of water to which the right attaches remains unfixed. Thus, an expanded riparian use has the potential to preempt an inferior appropriative right where the supply of water originally was sufficient to satisfy both uses.' " (*In re Waters of Long Valley Creek Stream System, supra,* 25 Cal.3d at p. 355, fn. 10, quoting the Governor's Com. To Review Cal. Water Rights Law, Final Rep. (Dec. 1978) p. 21.)

For all these reasons, we conclude that, to the extent the Poplar decision provides evidence of the nature of the Duncan Ditch water right, the right is appropriative rather than riparian. This is not to say that Harry Sickles and Charles Elster could not have "bargained away" their riparian rights if that had been their intention. But, in the absence of any clear evidence to that effect, it is unreasonable to assume they voluntarily gave up an unexercised water right that, with respect to the Poplar Irrigation Company, was virtually unlimited. " 'Undoubtedly a judgment purporting to adjudicate the title to real property must be as clear and explicit as a deed which purports to convey real property.' " (*Casad* v. *Qualls* (1977) 70 Cal.App.3d 921, 928 [139 Cal.Rptr. 243], quoting *People* v. *Rio Nido Co., Inc.* (1938) 29 Cal.App.2d 486, 489 [85 P.2d 461].)

It remains for us to determine the extent of the Duncan Ditch right held by the Borrors' predecessors in 1916. The Borrors maintain the right entitles them to divert *more* water than the amount adjudicated in Poplar. Their argument is unpersuasive.

We begin by noting that the permit system created by the 1914 Water Commission Act became the exclusive means for securing an appropriative water right after that date.[25] Neither the Borrors nor their predecessors have made an appropriation under the act, so their appropriative rights are limited to the amount of water they were diverting and putting to a reasonable beneficial use before then. Their rights in this case are limited more particularly to those that accrued prior to Pleasant Valley's appropriations.

The Borrors seek to establish the amount of their predecessors' Duncan Ditch diversions indirectly by first showing the number of acres under

---

[25]In its decision No. D 1018 dated June 30, 1961, the State Water Rights Board determined there was no unappropriated water in the Tule River and denied 21 pending applications to appropriate water dating back to 1953.

irrigation at various times prior to 1914, and by then calculating the amount of water necessary to irrigate that many acres. According to George Duncan's homestead proof, he settled with his family on Tract No. 1 in 1873 and, by 1881, had a 20-acre orchard/vineyard and 50 acres under cultivation. Two supporting declarations estimated Duncan's cultivated land to be one hundred acres. The Borrors adopt this larger figure. In 1898, Duncan sold a one-sixth interest in the Duncan Ditch to G. W. Fauset, the owner of Tract No. 2, and to C. E. Brockett. Assuming Fauset used the ditch to irrigate the same number of acres (12) in Tract No. 2 as they do now, the Borrors argue the ditch was supplying water to 112 acres by 1898. Assuming further an irrigation efficiency of 53 percent, this number of acres would have required 2.2 cfs of water. In 1914, the Poplar stipulation indicated the Borrors' predecessors, Sickles and Elster, were using the Duncan Ditch to irrigate land in Tracts No. 5 and 6, in addition to the three Poplar tracts. Assuming again that Sickles was irrigating the same number of acres (45) in Tract No. 5 as the Borrors are now, with a 53 percent efficiency, it would have been necessary in 1914 to divert 2.8 cfs of water to irrigate the 137 acres in Tracts No. 1, 2, 3, 5, and 6. The Borrors assert that one or the other of these amounts, 2.2 or 2.8 cfs, is the correct measure of their appropriative right.

There are several problems with the Borrors' reasoning. Although there is evidence that some parts of Tracts No. 2 and 5 were receiving water through the Duncan Ditch by 1914, there is nothing in the record to support the Borrors' assumption that the irrigation of those tracts was as extensive then as it was 20 years later when they bought the land, or that the water was being applied to crops with the same water needs. Further, as we have already explained, the Borrors' estimated 53 percent irrigation efficiency is based on their annual water use rather than on their peak monthly use, which yields an efficiency rate closer to 70 percent. Finally, and most importantly, we are not necessarily concerned here with the Duncan Ditch diversions in 1914, or even in 1898, but with the diversions prior to the accrual of Pleasant Valley's rights. According to Bulletin No. 94-1, the Duncan Ditch right accrued in "[a]bout 1860" and the Pleasant Valley Ditch right in "[a]bout 1870."

We believe the Poplar decision, although not binding between Pleasant Valley and the Borrors, nonetheless provides the best available evidence of their relative water rights. Since the rights of both accrued before those of the Poplar Irrigation District, it is difficult to conceive of a scenario under which the Borrors would have a greater right with respect to Pleasant Valley than they do with respect to the Poplar Irrigation District; indeed, the opposite is more apt to be true under the circumstances. Moreover, just as it is unlikely the Borrors' predecessors bargained away their riparian rights, it is unlikely they would have agreed to limit their Duncan Ditch diversions to

1.8 cfs if they were actually using 2.8 cfs. Therefore, we conclude that the Borrors have an appropriative right to divert 1.8 cfs of water from the Middle Fork of the Tule River by means of the Duncan Ditch, which right is prior and superior to Pleasant Valley's right to take any water from the river. As is generally the case with nonstatutory appropriations, the point or method of diversion or the place of use may be changed unless the rights of other users would thereby be impaired. (§ 1706; *San Bernardino* v. *Riverside* (1921) 186 Cal. 7, 28-29 [198 P. 784].) The Borrors, in other words, are not limited to exercising their Duncan Ditch water rights in the three Poplar tracts, absent a showing of harm.[26]

## C. *Pedigo Ditch.*

The record provides considerably less information about the origins of the Pedigo Ditch right. The Pedigo property (Tract No. 4), then consisting of three separate parcels, was patented from the United States to James Hubbs in 1893. Thomas Pedigo purchased two of the parcels in 1898 and the third in 1904. He then sold the portion of the third parcel lying north and west of the Tule River, leaving him with Tract No. 4 in its current configuration. Harry Sickles acquired the property in 1911. According to the Poplar decision, the Pedigo Ditch originated outside of Tract No. 4 in the southeast quarter of section 35 (the site of Tracts No. 3 and 5). We know little else about it, including when it was built and what part of the Pedigo property it was used to irrigate.

There is no dispute that the Borrors are the successors to the Pedigo Ditch right. Like the Duncan Ditch right, the Poplar decision appears to treat the Pedigo Ditch right as an appropriative one. It is again the case, for example, that some portions of Tract No. 4 are not "riparian" even though Poplar refers to the entire tract that way. If the right is appropriative, the Borrors would ordinarily be entitled, as they claim, to transfer it to the Duncan Ditch. But we need not decide the question because the Borrors have failed to establish that the Pedigo Ditch right, if appropriative, accrued prior to Pleasant Valley's right to divert water in its ditch.

## D. *The Borrors' Riparian Rights.*

Stanley Barnes, a civil engineer retained by the Borrors, testified as an expert witness on the subject of their riparian rights. Based on his review of the chains of title to Tracts No. 1 through 5, Mr. Barnes prepared a map of the Borrors' ranch outlining the portion of each tract he considered to be

---

[26]In its cross-appeal, Pleasant Valley contends the Borrors should be held to 1.42 cfs, the rate required to irrigate their 87 acres of permanent pasture in the 3 Poplar tracts (at an irrigation efficiency of 70 percent). This contention rests on a number of assumptions that we have determined to be incorrect, and is therefore rejected.

riparian to the Middle Fork of the Tule River, that is, "the smallest parcel with continuous ownership from and contiguity from the river to the time of patent to the present time." He then offered his estimate of the number of acres of irrigated pasture in each riparian parcel: 46 acres in Tract No. 1, 18 acres in Tract No. 2, and 18 acres in Tract No. 5, for a total of 82 acres (but only 64 acres in the three Poplar tracts). Pleasant Valley accepted Barnes's estimates at trial, as it does again on appeal, except on the question of severance.[27] As we have explained, Highway 190 runs through Tracts No. 1, 2, and 5 and, except for a few acres in Tract No. 2, it separates the Borrors' irrigated pasture from the Middle Fork. Therefore, if the sale in 1906 of the strip of land that later became the highway acted as a severance, virtually none of the Borrors' present pasture land would still have riparian status. The trial court evidently concluded there had been no severance because it reserved jurisdiction to consider the future expansion of the Borrors' riparian uses.

For purposes of our review, we accept as true, without deciding, that Highway 190 does indeed coincide with the strip of land conveyed in 1906 from Harry Sickles to A. G. Wishon.

The issue of severance typically arises after a riparian owner has conveyed a noncontiguous portion of his or her land to a third party and it then becomes necessary to decide whether the noncontiguous parcel has retained its former riparian status. The general rule in that situation is that riparian status has been lost absent language in the conveyance or some other manifestation of the parties' contrary intention. (Hutchins, The Cal. Law of Water Rights, *supra*, pp. 189-190, 195-196.) The situation here is somewhat different. We are not concerned with the status of the 40-foot strip but rather with the status of the property retained by the grantor on the other side of the strip.

In *Murphy Slough Assn.* v. *Avila* (1972) 27 Cal.App.3d 649 [104 Cal.Rptr. 136], this court considered the matter of severance in a situation much like

---

[27]We will therefore accept Mr. Barnes's figures as correct for purposes of our review. However, we note two apparent discrepancies. First, Barnes concluded there are 18 acres of irrigated pasture on the Borrors' riparian lands in Tract No. 2. This conflicts with all other estimates, including his own, putting at 12 the number of acres of pasture there. Second, he estimated there are 18 acres of riparian pasture in Tract No. 5 located immediately to the north of Highway 190, which divides the tract roughly in half and separates the pasture from the river in the south. These eighteen acres correspond roughly to one of the two parcels George Duncan purchased in 1892 from the Southern Pacific Railroad Company. The other parcel consisted of the southern half of Tract No. 5, i.e., the southeast quarter of the southeast quarter of section 35. The river flows through this other southern parcel. This being the case, it appears that most of the 18 acres of pasture north of the highway are not included within "the smallest tract held under one title in the chain of title leading to the present owner" and are therefore not riparian. (*Rancho Santa Margarita* v. *Vail, supra*, 11 Cal.2d at p. 529.)

the one now before us. In 1908, several riparian owners along Murphy Slough conveyed a 100-foot strip of land to a reclamation district for the construction of a levee. The strip was nearby and in some places adjacent to the slough, so the question many years later was whether the property on the far side of the levee had lost its riparian status. After concluding that the intent of the parties to the conveyance was the principal consideration, and extrinsic evidence was admissible to establish intent, we held that the deed to the strip, although it had purported to convey a fee interest, had actually been intended to convey only a right-of-way. "Being a grant of a right-of-way, the deed neither conveyed a riparian interest to the grantee nor severed riparian rights from the grantors' remaining lands south of the levee. [Citation.]" (*Id.* at p. 658.) Moreover, "[e]ven if the trial court had concluded that the deed conveyed a fee interest to the grantee, it seems clear to us such a conveyance would have no effect on the riparian rights of the grantors' remaining lands not included in the conveyance, absent some expression to the contrary." (*Ibid.*)

In determining the parties' intent, the *Murphy Slough* court noted that the reclamation district had paid only a nominal sum for the strip of land, that riparian rights would have been of no use on land destined to be used for a levee, and that the grantors had continued for 30 years after the conveyance to divert water to their property beyond the levee without any intervention by the reclamation district. (*Murphy Slough Assn.* v. *Avila, supra,* 27 Cal.App.3d at pp. 655-658.) Similar considerations apply in this case. The 1906 deed made no mention of riparian rights, and it would be unreasonable to suppose that Harry Sickles intended to give up his rights on the irrigable portions of his property by granting what amounted to nothing more than the "right of way for a wagon road" along the river. Pleasant Valley makes no real argument to the contrary.[28] We conclude that the 1906 conveyance did not sever any riparian rights held by the Borrors' predecessors.

As previously discussed, the 1928 constitutional amendment limited a riparian owner as against an appropriator (as well as against other riparians) to the reasonable beneficial uses of water, present and prospective. The riparian owner still has a paramount right to all the water of the stream that he or she can put to such uses, but this is the extent of the right and any surplus is subject to appropriation. (*Meridian, Ltd.* v. *San Francisco, supra,* 13 Cal.2d 424, 447; *Tulare Dist.* v. *Lindsay-Strathmore Dist., supra,* 3 Cal.2d at p. 525.) Here the trial court concluded the Borrors' present irrigation of their permanent pasture is a reasonably efficient use. Consequently, accepting that the Borrors do indeed have 82 acres of permanent pasture on land

---

[28]Indeed, it would be incongruous for Pleasant Valley to argue that the Poplar decision adjudicated the Borrors' riparian rights while claiming at the same time that the rights had been severed 10 years earlier.

that is still riparian to the Middle Fork of the Tule River, they would have a present riparian right with respect to Pleasant Valley to divert 1.33 cfs of water for use on that land apart from their prior appropriative right to divert 1.8 cfs.[29]

The Borrors also have a riparian right paramount to Pleasant Valley to the *prospective* reasonable beneficial uses of the water from the Middle Fork. (§ 101; *Tulare Dist.* v. *Lindsay-Strathmore Dist., supra,* 3 Cal.2d at p. 525.) "As to such future or prospective reasonable beneficial uses, it is quite obvious that the quantity of water so required for such uses cannot be fixed in amount until the need for such use arises. Therefore, as to such uses, the trial court, in its findings and judgment, should declare such prospective uses paramount to any right of the appropriator. By such declaratory judgment, the rights of the riparian will be fully protected against the appropriative use ripening into a right by prescription, but, until the riparian needs the water, the appropriator may use it, thus, at all times, putting all of the available water to beneficial uses. The trial court might well, by appropriate provisions in its judgment, retain jurisdiction over the cause, so that when a riparian claims the need for water, the right to which was awarded him under such a declaratory decree, the trial court may determine whether the proposed new use, under all the circumstances, is a reasonable beneficial use and, if so, the quantity required for such use." (*Tulare Dist.* v. *Lindsay-Strathmore Dist., supra,* 3 Cal.2d at p. 525.)

The trial court, after noting the Borrors are currently using their Duncan Ditch right on 87 acres of pasture land in Tracts No. 1, 2, and 3, reserved jurisdiction "to determine whether or not the defendants may have any further rights to riparian use of the Tule River in the event they wish to develop any additional acreage within the boundaries of [these three tracts]." As we have already explained, not all of these 87 acres are entitled to receive "riparian" water. And, insofar as the Borrors' water use is appropriative in nature, it is not necessarily confined to the three Poplar tracts. The Borrors properly object to one additional aspect of the court's reservation of jurisdiction.

The court decreed that any future allocation of riparian water would be made in accordance with *In re Waters of Long Valley Creek Stream System, supra,* 25 Cal.3d 339. In *Long Valley,* the Supreme Court was concerned with the power of the State Water Resources Control Board to limit prospective riparian rights in an adjudication of all claims to the water in a particular stream system pursuant to the statutory procedure set out in section 2500 et

---

[29]Pleasant Valley does not claim that any of its appropriative rights have priority over the Borrors' riparian right by virtue of having accrued on the public domain before the Borrors' property passed into private ownership.

seq. The court concluded the board, although not authorized to extinguish such rights altogether, could quantify them or subordinate them to existing uses. (*In re Waters of Long Valley Creek Stream System*, *supra*, 25 Cal.3d at pp. 358-359.) No such flexibility exists in a private lawsuit like this one.

In a statutory stream adjudication, the board is empowered to determine "all rights to water of a stream system whether based upon appropriation, riparian right, or other basis of right." (§ 2501.)

Certain features distinguish a statutory adjudication from a private suit involving only some of the water users on a stream. In *Long Valley* the Supreme Court explained:

"It is true that a substantial body of case law concerning a riparian's prospective rights has developed in this state as a result of private lawsuits between various water rights claimants. Thus, for example, this court has recognized that (1) the rights of a riparian owner are not destroyed or impaired by the fact that he has not yet used the water upon his riparian lands, and therefore that the riparian right exists, whether exercised or not [citations]; (2) a dormant riparian right is paramount to active appropriative rights [citation]; and (3) in resolving a dispute between a riparian who claims a prospective water right and other claimants, it may be proper for the trial court to retain jurisdiction over the matter so that the riparian's prospective right can be quantified at the time he decides to exercise it [citations].

"Such principles, however, are limited in their application to a context in which water rights are determined through piecemeal adjudication that will settle disputes among only a small number of those persons who claim a right to the use of water in a stream system. The judgment in this type of adjudication necessarily can bind only those who are parties to the litigation; it may subsequently be nullified by the assertion of a legitimate claim by a water user on the stream who was not a party to the suit. The most that a trial court can do in such a case, therefore, is to retain jurisdiction over prospective riparian claims.

"This court has never declared that the foregoing approach is to be preferred over a statutory procedure for the comprehensive determination of *all* rights to the use of water in a stream system; rather, we have recognized that there is a limitation inherent in the ability of private lawsuits to provide clarity, certainty, and security to water rights and water users. . . . Our analysis of the nature of the prospective riparian right in this context therefore does not imply that the Legislature may not define or otherwise limit the scope of such a right, or delegate to the Board the authority to do so in a statutory adjudication proceeding." (*In re Waters of Long Valley Creek Stream System*, *supra*, 25 Cal.3d at pp. 347-348, fn. omitted.)

Thus *Long Valley* has no direct application in this case to a future determination of the Borrors' as yet unexercised riparian rights.[30] Rather, the determination is governed by the principles enunciated in *Tulare Dist.* v. *Lindsay-Strathmore Dist., supra,* 3 Cal.2d 489. (See *Wright* v. *Goleta Water Dist.* (1985) 174 Cal.App.3d 74, 89 [219 Cal.Rptr. 740] [*Long Valley* not applicable in private suit to limit prospective groundwater rights].)

### E. *The Borrors' Prescriptive Rights.*

The Borrors contend their long-standing diversion of 4 cfs of water in the Duncan Ditch, to the extent it exceeds their rightful appropriative and riparian uses, has ripened into a prescriptive right as against all Tule River water users. We are concerned here only with any additional rights the Borrors may have acquired in relation to Pleasant Valley.

"The facts or elements which are necessary to the existence of a prescriptive water right have been set forth in a veritable forest of cases. To perfect such right, the use of the water must be: (1) actual, (2) open and notorious, (3) hostile and adverse to the original owner's title, (4) continuous and uninterrupted for the statutory period, and (5) under a claim of title in the claimant, and not by virtue of another right. [Citation.] The burden is upon the party who claims title by prescription to clearly prove by competent evidence all the elements essential to such title." (*Peck* v. *Howard* (1946) 73 Cal.App.2d 308, 325-326 [167 P.2d 753].) A use is not adverse unless it deprives the owner of water to which he or she is entitled. (*City of Pasadena* v. *City of Alhambra* (1949) 33 Cal.2d 908, 927 [207 P.2d 17]; *Pabst* v. *Finmand, supra,* 190 Cal. at p. 128.) There is no evidence in this case that the Borrors' water use in excess of the amount they could rightfully divert impaired Pleasant Valley's rights in any significant way prior to 1990. Insofar as the Borrors are asserting a right against other downstream users, or against the surplus waters held in trust by the state, their claim is similarly infirm. (*People* v. *Shirokow, supra,* 26 Cal.3d at pp. 311-312.)

### F. *Pleasant Valley's Water Rights.*

It is axiomatic that Pleasant Valley, in order to prevail in this action, must prove not only that the Borrors diverted water in excess of their rights, but also that their excess diversions intruded upon Pleasant Valley's rights. "[N]o one has the right to complain even of an unlawful diversion unless he

---

[30]However, the Water Code does permit the court to refer matters before it to the State Water Resources Control Board. Section 2000 provides: "In any suit brought in any court of competent jurisdiction in this State for determination of rights to water, the court may order a reference to the board, as referee, of any or all issues involved in the suit." The court may also refer the suit to the board "for investigation of and report upon any or all of the physical facts involved." (§ 2001.)

is injured thereby . . . ." (*Holmes* v. *Nay, supra*, 186 Cal. 231, 242.) The Borrors argue Pleasant Valley has failed to establish both the amount of its rights and an injury to those rights caused by the Borrors.

Pleasant Valley asserted in its complaint an appropriative right to divert 6 cfs of water, superior to the Borrors' right to divert anything more than 1.8 cfs. Pleasant Valley's claim was based upon its Poplar allocation of 5 cfs plus an additional 1 cfs which, according to Bulletin No. 94-1, it had acquired in the interim between the 1916 Poplar decision and the Jones decision in 1933. Pleasant Valley claimed during trial to have purchased additional water rights bringing its total entitlement to 7.5 cfs. In September of 1991, Pleasant Valley reached a mutual allocation agreement with the Graham-Osborn and Mt. Whitney ditch companies in which it agreed to reduce its diversions from the Tule River whenever the flow was insufficient to supply it with 6.5 cfs of water. The trial court concluded that the Borrors' diversions above their Poplar allotment had caused Pleasant Valley to receive less than its entitlement, but did not specify what that entitlement was: "6. Prior to trial, the defendants have used water in significant rates of flow in excess of that to which they have been entitled to under the Poplar judgment. As a result of these excessive rates of flow, the plaintiff has from time to time been unable to obtain its entitlement of water, which has caused the shareholders of Pleasant Valley Canal Company to suffer damages to their lands. . . ."

This conclusion is effectively refuted, the Borrors contend, by Pleasant Valley's water diversion reports to the state declaring under penalty of perjury that it took its full allotment of water in some of the same months in which it now claims to have suffered shortages.[31] The Borrors argue further that Pleasant Valley consented to any shortages by entering into an allocation agreement with two other ditch companies whose rights are allegedly inferior to its own.[32]

Glenn Wallace, a member of the board of directors, testified that in October of 1990, just before filing suit against the Borrors, Pleasant Valley

---

[31]The Borrors contend Pleasant Valley's filing of the inflated diversion reports, like the inconsistent position it has taken in regard to the Rose Ditch water transfer, is conduct that cries out for application of the doctrine of unclean hands: "One cannot conceive of a party more fully clothed in bad faith and inequitable conduct than Pleasant Valley." However, "[t]he unconscionable conduct must be of such a nature that it would, if permitted to go unnoticed, result in prejudice to the other party." (*Soon* v. *Beckman* (1965) 234 Cal.App.2d 33, 36 [44 Cal.Rptr. 190].) Under the circumstances, the Borrors have little to complain about.

[32]According to Bulletin No. 94-1, Pleasant Valley's rights accrued in "[a]bout 1870," the Graham-Osborn Ditch right in 1871, and the Mt. Whitney Ditch right in "[a]bout 1880." The rights of all three ditch companies were adjudicated in the Glover, Poplar, and Jones decisions but with inconsistent results. Thus, although Pleasant Valley sued the other two claiming a superior water right, the matter of their relative priorities has never been settled, and so it is

was able to divert no more than 1.5 or 2.0 cfs of water and so was forced to curtail deliveries to several of its shareholders. The same reportedly was true in 1992 and 1994. Wallace and others explained that Pleasant Valley reported to the state that it had used its full allotment of water for fear of losing its right if it reported something less. This testimony, although sparse, is sufficient to establish that, in 1990 at least, Pleasant Valley suffered a shortage of water whatever its actual entitlement under the law or the allocation agreement. Therefore, assuming the shortage was caused by the Borrors diverting too much water rather than by the Edison Company refilling its forebay, the court's conclusion is correct as far as it goes. (See *Moore* v. *Cal. Oregon Power Co.* (1943) 22 Cal.2d 725, 741 [140 P.2d 798].) It is still necessary, however, to determine the extent of Pleasant Valley's water rights in relation to the Borrors.

For the reasons already discussed, our starting point is the Poplar decision, which allots Pleasant Valley 5 cfs. Relying entirely on Bulletin No. 94-1, Pleasant Valley claims a right to an additional 1 cfs, but has neglected to offer any evidence to show when the right accrued. This omission is significant depending upon whether it accrued before or after the Borrors' Pedigo Ditch right. (As we previously noted, this same infirmity affects Borrors' right against Pleasant Valley.) Likewise, Pleasant Valley has provided scant support for its claim to 1.5 cfs in addition to the 6 cfs alleged in its complaint, and indeed has never amended the complaint to allege the greater amount. Accordingly, Pleasant Valley has failed to demonstrate a right relative to the Borrors to divert anything more than 5 cfs of water.

It follows that the water rights of Pleasant Valley and the Borrors relative to one another, once they are finally determined, establish the limits of any injunction in this case. ▪ "Of course, before the plaintiff could invoke the power of a court of equity to restrain the diversion of water above its lands, it would be necessary for it to show first, that there was a wrongful diversion of water above its lands, and second, that the amount wrongfully diverted would be rightfully used by plaintiff and that the water is being used or would be used for reasonable and beneficial purposes." (*Carlsbad etc. Co.* v. *San Luis Rey etc. Co.* (1947) 78 Cal.App.2d 900, 914 [178 P.2d 844]; see also *Meridian, Ltd.* v. *San Francisco, supra,* 13 Cal.2d at p. 457.)

### III. CONCLUSION

▪ In summary, we conclude the Poplar decision has no preclusive or binding effect on the parties in this case, but it does provide persuasive evidence of the nature and extent of their historic water use. Based on this

---

not possible to determine with any certainty just what Pleasant Valley gave up, if anything, in the allocation agreement.

and other evidence presented at trial, the Borrors have established their appropriative right to divert no more than 1.8 cfs of water by means of the Duncan Ditch, which right is prior and superior to Pleasant Valley's appropriative right to divert 5 cfs. The Borrors are not restricted to using this water on their lands identified in the Poplar decision.

The Borrors are also the successors to the Pedigo Ditch right to divert 0.3 cfs of water, and Pleasant Valley claims additional rights bringing its total entitlement to 7.5 cfs. The cause must be remanded to the trial court to determine the nature and extent of these rights, and their relative priorities.

In addition to their appropriative rights, the Borrors, as the owners of land riparian to the Middle Fork of the Tule River, have a riparian right paramount to Pleasant Valley to divert as much water as they are putting to reasonable beneficial uses on that land. If and when the Borrors expand or change their riparian uses, their right must be determined in accordance with the principles set out in *Tulare Dist.* v. *Lindsay-Strathmore Dist., supra,* 3 Cal.2d 489.

The Borrors have failed to show they have acquired any water right with respect to Pleasant Valley by prescription.

Finally, any final determination in this case of the water rights of Pleasant Valley and the Borrors in relation to one another binds them alone and is in no way determinative of their rights with respect to any other water user on the Tule River. Moreover, it applies only to the Borrors' rights in the Duncan Ditch and Pedigo Ditch and does not affect any other water rights they may have or may acquire in the future.

### DISPOSITION

Except as to issues not raised on appeal and not discussed in this opinion, the judgment is reversed and is remanded for further proceedings consistent with this opinion.

Costs are awarded to appellants.

Dibiaso, Acting P. J., and Thaxter, J., concurred.

APPENDIX